FILED

2012 SEP -4 PM 4: 14

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY_____

1  Robert H. Dewberry, SB #89354
   theDewberryfirm
2  20271 SW Birch Street #100
3  Newport Beach, CA 92660
   Tel:  (949) 955-2940
4  Fax:  (949) 209-3883
5  Email:  robert.dewberry@dewlaw.net

6

7  Robert V. Cornish, Jr.
   **DILWORTH PAXSON LLP**
8  655 15th Street NW, Suite 810
9  Washington, DC 20005
   Tel:   (202) 466-9158
10 Fax:   (202) 452-0930
11 Email:  rcornish@dilworthlaw.com
12 Admission *pro hac vice* pending

13             **UNITED STATES DISTRICT COURT**
14             **CENTRAL DISTRICT OF CALIFORNIA**
                    **SOUTHERN DIVISION**
15

16  ----------------------------------------------------------------
17                                            **SACV12 - 1448 AG (JPRx)**
    **WILLIAM WILBER; NICOLE KHARZI, KAREN**
18  **OLDMIXON, LARRY CAIN, ROBYN JAMISON, OTTO**
19  **FOX, GAIL YOUNG, MARK THOMAS, CINDY**
    **DICOSIMO, CAROL WINKLER and DAVID WINKLER,**
20                                            **VERIFIED**
21        **Plaintiffs,**                     **COMPLAINT**
                                               **AND**
22  **TOP GLOBAL CAPITAL, INC.; WAL CAPITAL, LLC;**  **JURY**
23  **WAL CAPITAL, S.A.; APEX GLOBAL EXCHANGE,**     **DEMAND**
    **LTD.; MY FOREX PLANET, INC.; ZENOOST, INC;**
24  **CTN SYSTEMS CORP.; MORRIS MOSKOWITZ.;**
25  **METAQUOTES SOFTWARE CORP.; DUKASCOPY**
    **BANK, S.A.; COLDWELL, LTD.; FAIRFIELD LAW**
26  **FIRM S.A.; LISBETH GONZALEZ HERNANDEZ;**
27  **JAVIER GIL VALLARINO; MELODY PHAN; MARC**
    **WALLACK; GLENN ALCARAZ; ROSAURA**
28

                    **VERIFIED COMPLAINT**

9594801_4

**PATRICIA BARQUERO CASARES; SAMUEL VILCHEZ; ROY BAKER and JOHN DOES 1-100,**

            **Defendants.**

---------------------------------------------------------------------------------

Plaintiffs William Wilber ("Wilber"), Nicole Kharzi ("Kharzi"), Karen Oldmixon ("Oldmixon"), Larry Cain ("Cain"), Robyn Jamison and Otto Fox (the "Jamisons"), Gail Young ("Young"), Mark Thomas ("Thomas"), Cindy DiCosimo ("DiCosimo"), Carol Winkler and David Winkler (the "Winklers") (collectively "Plaintiffs"), by and through undersigned counsel, herewith submit their Verified Complaint against Top Global Capital, Inc. ("TGC"), Wal Capital, LLC ("Wal USA"), Wal Capital, S.A. ("Wal Costa Rica"), Apex Global Exchange, Ltd.. ("Apex"), My Forex Planet, Inc., ("My Forex Planet"), Zenoost, Inc. ("Zenoost"), CTN Systems ("CTN"), Morris Moskowitz ("Moskowitz"), MetaQuotes Software Corp. ("Metatrader"), Dukascopy Bank, S.A ("Dukascopy"), Coldwell, Ltd. ("Coldwell"), The Fairfield Law Firm, S.A. ("Fairfield Law Firm"), Lisbeth Gonzalez Hernandez ("Hernandez"), Javier Gil Vallarino ("Vallarino"), Melody Phan ("Phan"), Marc Wallack ("Wallack"), Glenn Alcaraz ("Alcaraz"), Rosaura Patricia Barquero Casares ("Casares"), Samuel Vilchez ("Vilchez"), Roy Baker ("Baker") and John Does 1-100 (the "Doe Defendants") (collectively "Defendants") and allege as follows:

## JURISDICTION AND VENUE

### VERIFIED COMPLAINT

2

9594801_4

1.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332, insofar as the matter involves parties of diverse citizenship and the amount in controversy exceeds $75,000.00.   This Court also has jurisdiction over this matter pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. §§ 1331 and 1367 based upon the civil RICO claims brought herein, which arise under the laws of the United States.

2.      This Court has supplemental jurisdiction over the non-federal claims asserted herein under 28 U.S.C. § 1367.

3.      This Court has jurisdiction over each Defendant named herein because each Defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and justice.

4.      Venue is proper in this District pursuant to 28 U.S.C. §1391(g), as this matter involves multiple parties and several defendants reside within this District.

**THE PLAINTIFFS**

5.      Plaintiff Wilber is resident of the Commonwealth of Virginia who invested $10,000 in foreign currency trading vehicles formed, managed and/or operated by the Defendants.   To date, Wilber has received only $2,500 back and $7,500 is either missing or misappropriated.

6.      Plaintiff Kharzi is a resident of the State of Texas who invested $10,412 in foreign currency trading vehicles formed, managed and/or operated by the

**VERIFIED COMPLAINT**

3

9594801_4

Defendants.   To date, all of Kharzi's investments are either missing or misappropriated.

7.   Plaintiff Oldmixon is a resident of the State of Texas who invested $100,000 in foreign currency trading vehicles formed, managed and/or operated by the Defendants.   To date, all of Oldmixon's investments are either missing or misappropriated.

8.   Plaintiff Cain is a resident of the State of Arizona who invested $320,000 in foreign currency trading vehicles formed, managed and/or operated by the Defendants.  To date, Cain has received only $42,000 back from those investments, with the balance of his investments missing or misappropriated.

9.   Plaintiff DiCosimo is a resident of the State of Texas who invested $32,500 in foreign currency trading vehicles formed, managed and/or operated by the Defendants.   To date, DiCosimo has received only $15,975 back from those investments, with the balance of her investments missing or misappropriated.

10.   Plaintiffs the Winklers are a married couple who are residents of the State of Washington.  The Winklers invested $5,000 in foreign currency trading vehicles formed, managed and/or operated by the Defendants.  To date, all of the Winklers' investments are either missing or misappropriated.

**VERIFIED COMPLAINT**

4

9594801_4

11.     Thomas is a resident of Texas who invested $75,000 in foreign currency trading vehicles formed, managed and/or operated by the Defendants.  To date, all of Thomas' investments are either missing or misappropriated.

12.     Plaintiffs the Jamisons are residents of Texas who invested $4,000 in foreign currency trading vehicles formed, managed and/or operated by the Defendants.  To date, all of Jamison's investments are either missing or misappropriated.

13.     Young is a resident of Texas who invested $59,675 in foreign currency trading vehicles formed, managed and/or operated by the Defendants.  To date, Young has received only $29,475 back from those investments, with the balance of her investments missing or misappropriated.

## THE DEFENDANTS

14.     Phan was at all times relevant to this proceeding the President of Wal USA, Zenoost, My Forex Planet and Director of Operations of Wal Costa Rica.  The last known address of Phan is 8811 Gilman Drive, Apartment C, La Jolla, California 92037.  Phan was not and has not been licensed by any securities or commodities regulator at any time relevant to this proceeding.  On information and belief, Phan has provided on-the-record testimony to the Commodities Futures Trading Commission ("CFTC") and produced documents concerning her involvement with Wal USA, Wal Costa Rica, TGC and other entities involved in the highly questionable facilitation and management of the currency trading at issue in this Complaint.

**VERIFIED COMPLAINT**

5

15.     Wallack is the ex-husband of Phan who served as an officer, director and agent of Wal USA, Wal Costa Rica, My Forex Planet and Zenoost.    Wallack was granted a full power of attorney over the affairs of Wal Costa Rica by its officers and directors in Costa Rica.   In addition, on information and belief, Wallack also traveled to Hong Kong at the direction of Phan for purposes of forming Apex and served as the point of contact for their respective service providers. Wallack was not and has not been licensed by any securities or commodities regulator at any time relevant to this proceeding.   Wallack now resides in Lakewood, California.   On information and belief, Wallack has also provided on-the-record testimony to the CFTC and documents regarding the currency trading at issue in this Complaint.

16.     Coldwell is a company purportedly "specializing in offshore company registration" with offices at 1461 1st Avenue, Suite 360, New York, New York. Coldwell's London office at 95 Wilton Road, Suite 3, London, England shared the same address as TGC.   On information and belief, Phan and Wallack utilized the services of Coldwell from its New York offices to form Wal Costa Rica, TGC and Apex.

17.     The Fairfield Law Firm is the last designated President of TGC and was formed as a corporation in Panama on July 10, 2009.   On information and belief, The Fairfield Law Firm  or its agents formed TGC at the request of Coldwell on behalf of Defendants Phan and Wallack.

**VERIFIED COMPLAINT**

9594801_4

18.     TGC is a corporation formed in the Republic of Panama on or about November 2, 2009 (see printout from Public Registry of Panama annexed hereto as *Exhibit "1"*) sharing a primary office address of Defendant Coldwell at 95 Wilton Road, Suite 3, London, England.   TGC purported to be a "licensed diversified capital/fund management company" under the regulatory of the "Europe Financial Regulation Firm," although TGC possesses no such licenses and there is no such regulatory agency.   Defendant Fairfield Law Firm serves as the President of TGC, while Defendant Hernandez serves as its Treasurer and Defendant Vallarino serves as its Secretary.   On information and belief, TGC was formed at the instructions of Phan, Wallack and Coldwell by Defendant Fairfield Law Firm for the purpose of facilitating wrongful acts through fraudulent foreign currency trading.

19.     Wal USA was a California Limited Liability Company formed by Defendants Phan and Wallack on or about January 30, 2008.   Phan and Wallack served as officers and directors of Wal USA.   The last known address of Wal USA is 2030 Main Street, Suite 300, Irvine, California 92614.   On information and belief, Wal USA served as a conduit through which funds were directed by Phan and Wallack to Wal Costa Rica, Apex and TGC.

20.     Wal Costa Rica is a corporation formed in the Republic of Costa Rica on or about June 20, 2008 (see documents from Corporate Registry of Costa Rica annexed hereto as *Exhibit "2"*).   Defendants Caseres is the President of Wal Costa Rica.

**VERIFIED COMPLAINT**

7

Defendant Vilchez is the Secretary of Wal Costa Rica.  The last known office address of Wal Costa Rica is Leutschenbachstrasse 95, 8050 Zürich, Switzerland, with an address of record of 25 Oeste, Edificio Asesores Adunaneles, San Jose, Costa Rica. Plaintiffs have reason to believe, however, that Wal Costa Rica may have also operated from 13139 Brookhurst Street, Suite C, Garden Grove, California 92843, given wire instruction forms provided by Phan to Plaintiffs and others.  On July 24, 2008, Defendant Wallack obtained a corporate power of attorney to administer the affairs of Wal Costa Rica with the approval of Defendants Casares and Vilchez. On information and belief, Defendants Wallack and Phan utilized the services of Defendant Coldwell to obtain the power of attorney over the affairs of Wal Costa Rica.  On December 9, 2010, Wal Costa Rica was blacklisted by Swiss financial authorities.

21.    Apex is a Hong Kong Corporation formed on or about December 11, 2010 with a last known address of 35/F, Central Plaza, 18 Harbour Road, Wanchai, Hong Kong.  On information and belief, Apex was formed by Phan and Wallack with the assistance of Coldwell.  The apparent purpose of Apex was to handle the disposition of funds invested in TGC by way of a merger or asset purchase of Wal Costa Rica.

22.    My Forex Planet was a Nevada corporation formed in May 2006 by Defendants Phan and Wallack for the purpose of providing training in foreign currency trading to novice investors, including but not limited to Plaintiffs.  My Forex Planet

**VERIFIED COMPLAINT**

8

was later used as a conduit for funds for disposition by Wal Costa Rica, TGC and Apex.  The last known business address of My Forex Planet was 10885 Kalama River Avenue, Fountain Valley, California 92708.  Prior to this address change, My Forex Planet shared offices with Wal USA and other corporate entities under the control of Phan and Wallack.

23.  Zenoost is a California corporation formed in June 2007 by Defendants Phan and Wallack.  The address of record of Zenoost on file with the California Secretary of State is  18685 Main Street, Suite 101-167, Huntington Beach, California 92648.  Zenoost accepted funds from Plaintiffs Young, Thomas and Oldmixon for purposes of facilitating investments in foreign currency through TGC, Wal Costa Rica and Apex.  Zenoost repaid invested funds of Plaintiff Wilber in TGC and Wal Costa Rica notwithstanding that Wilber never sent Zenoost any money.

24.  CTN is a service provider to currency traders operating from its offices at 172 Madison Avenue, New York, New York, under the control of its CEO, Defendant Moskowitz, who is a resident of Monsey, New York. With the approval of CTN and Moskowitz, and at the request of Wal USA and Wal Costa Rica, CTN provided Phan and Wallack the software necessary to facilitate the trading in foreign currency for Wal Costa Rica, My Forex Planet and TGC through defendant Dukascopy.

25.  Metatrader is a corporation with offices in Australia, Cyprus and elsewhere that, on information and belief, has agreements with Defendant Dukascopy

VERIFIED COMPLAINT

to provide currency trading software under the name "Metatrader" to investment managers, individuals and others.  Metatrader replaced CTN in May 2010 as the trading platform utilized by Wal USA, Wal Costa Rica, My Forex Planet and Apex for the conduct of currency trading through Defendant Dukascopy.

26.    Dukascopy is a foreign currency trading firm based with its headquarters at Route de Pré-Bois 20, 1217 Meyrin, Geneva, Switzerland.  Dukascopy opened and maintained accounts for foreign currency trading with Wal Costa Rica on behalf of TGC and, on information and belief, Wal USA, My Forex Planet and Apex on behalf of Plaintiffs through CTN and Metatrader.

27.    Alcaraz served as the Director of Sales and Marketing for TGC based from Phan's offices in California and in the Philippines.  Alcaraz also served as a primary contact with Plaintiffs with respect to the status and safety of their foreign currency investments.  Alcaraz is not and has not ever been licensed by any securities or commodities regulator.  On information and belief, Alcaraz resides in Chino Hills, California.

28.    Baker has been or was the Operations Manager for Wal Costa Rica from at least June 7, 2010 to the present.  Plaintiffs do not presently know whether Baker was in the United States, Switzerland or elsewhere, or even if his real name was Baker.

29.    The Doe Defendants are, among other unknown persons involved in the wrongdoings described herein, including but not limited to (a) the officers and

**VERIFIED COMPLAINT**

directors of TGC Hong Kong, (b) the officers and directors of Apex and (c) the personnel who actually conducted trading and handled client funds at TGC.

## NON-PARTIES

30.     Top Global Capital, Ltd. ("TGC Hong Kong") is, on information and belief, a non-United States based corporation created by one or more of the Defendants for purposes of facilitating wires of funds allegedly invested with either TGC or Defendant Apex.   The officers, managers and supervisory personnel of TGC Hong Kong are currently unknown to Plaintiffs.   As such, Plaintiffs reserve their right to name TGC Hong Kong and its officers once further facts are known about its operations.

## BRIEF SUMMARY

31.     This case involves the loss of millions of dollars in a currency trading scam of which the current Plaintiffs are but a small part. The trust of unsuspecting investors in Phan, Wallack and others led to the disappearance of their hard earned dollars.   Each Defendant named in this case had an opportunity to decide given the "red flags" before them whether their respective course of conduct was facilitating a fraud.   None of them made the right decision and instead provided the means by which the vast preponderance of Plaintiffs' funds would disappear and never be seen again. Plaintiffs in this action seek to recover those funds wrongfully taken from them.

**VERIFIED COMPLAINT**

11

32.     Plaintiffs also seek an injunction and immediate and permanent appointment of a receiver for Wal USA, My Forex Planet, Zenoost, all of which were the corporate vehicles domiciled in the United States through which Plaintiffs' funds were custodied and thereafter misappropriated, as well as for Phan and Wallack.

33.     Plaintiffs further seek an immediate accounting of TGC, Wal Costa Rica, Wal USA, Apex, My Forex Planet and Zenoost to determine where the Plaintiffs' assets have been diverted for purposes of recovering such converted assets on their behalf.

## STATEMENT OF FACTS

34.     In May 2006, Phan and Wallack formed My Forex Planet to offer training services to novice investors and others interested in trading global currency markets. The training that Phan and Wallack offered was provided through both on-site in various offices in California, via the internet through webinars and through the provision of training materials directly to others either electronically or through the United States mail.

35.     My Forex Planet offered a "live" and a "demo" trading system, whereby students would practice their currency trading under Phan's instruction without risk of losing their capital.  The students would then "graduate" to a funded account that they would trade for themselves.  Phan was generally held in high regard by her students for

**VERIFIED COMPLAINT**

12

her trading acumen and purported successes in making substantial profits in the currency markets

36.     On information and belief, My Forex Planet utilized, and had its students utilize, the services of CTN through its "ChoiceFX" trading system which directed such trades for settlement with Dukascopy.   On information and belief, accounts opened on behalf of students of My Forex Planet were carried and cleared at Dukascopy, and these accounts generated referral fees and commissions that were paid from Dukascopy to CTN, My Forex Planet and ultimately to Phan and Wallack. However, as is more fully described herein, the trading that was facilitated for students of My Forex Planet was more likely than not fictitious "demo" trading that provided a cloak for the misappropriation of funds.

37.     Because My Forex Planet was likely receiving referral fees, commissions, margin interest and other revenue generated from the trading of its students, Phan and Wallack knew or should have known that the cessation or diminution or cessation of the flow of these payments would necessarily mean that trading volume had decreased, stopped altogether or was never actually happening.

38.     In approximately early 2007, Phan became involved with a group of individuals who practiced an advanced form of meditation ("Meditation") through a respected instructor whose pupils were across the United States.  Phan developed personal relationships, described her trading successes and garnered the trust of several

**VERIFIED COMPLAINT**

13

of her fellow Meditation students and ultimately convinced many of them, including Plaintiffs Cain, Kharzi, Jamison and others, to enroll in the currency trading training programs offered by My Forex Planet.

39.     In late 2007, Phan and Wallack realized that they were sitting on a mother lode of revenue not only from potential students for My Forex Planet from the Meditation group, but for additional commission and referral revenue for trading. Given the trust and affinity developed by Phan with fellow Meditation students, Phan and Wallack realized that they could gather large sums of money from these students who were willing to place their money in an investment strategy operated by an apparently successful and trusted fellow student.

40.     The veneer of success that Phan exuded to Plaintiffs and others was a sham.  On information and belief, Phan and Wallack had made risky real estate investments in California, were falling behind on mortgage payments and could not "flip" the properties they owned at a profit or "break-even" point.

41.     In January 2008 or thereabouts, Phan and Wallack decided to create a currency trading management company that would gather the funds of students of My Forex Planet and the investors that they would refer as potential investors. Accordingly, Wal USA was formed.  Phan and Wallack opened bank accounts at a Bank of America branch in Garden Grove, California to accept funds for investment with Wal USA.  Phan and Wallack also opened merchant accounts for Wal USA

**VERIFIED COMPLAINT**

14

accept credit cards to fund trading. The funds gathered by Phan and Wallack on behalf of Wal USA and My Forex Planet were, on information and belief, commingled for trading through Defendants CTN and Dukascopy, who had ongoing business relationships with My Forex Planet, Phan and Wallack.

42. On information and belief, in early 2008, CTN (through Moskowitz in New York City or agents of CTN at his express direction) and Dukascopy informed Phan and/or Wallack that they would not handle a pooled currency trading account of any significance based in the United States, but would instead accept such accounts from entities outside of the United States. Phan and Wallack thereafter determined that their currency trading venture required an offshore corporate entity to capture the enormous revenue that students of the Meditation class and others represented.

43. On information and belief, in Spring 2008, Phan and/or Wallack contacted Coldwell to inquire about forming an offshore entity to facilitate currency trading for students of My Forex Planet. Upon the recommendation of Coldwell, Phan and Wallack determined that a corporate entity in Costa Rica would best serve their illicit needs.

44. On information and belief, Coldwell arranged for the formation of Wal Costa Rica in June 2008. Defendants Casares and Vilchez were appointed as officers for Wal Costa Rica. In July 2008, Casares and Vilchez granted Wallack *full power of attorney* over the affairs of Wal Costa Rica. On information and belief, the facilitation

**VERIFIED COMPLAINT**

of the grant of this power of attorney to Wallack was handled and coordinated by Coldwell.

45.     Under the corporate laws of Costa Rica, notwithstanding their grant of power of attorney to Wallack, Casares and Vilchez as officers of Wal Costa Rica continued to bear responsibility for its corporate decisions and conduct. Under the laws of Panama, Fairfield Law Firm, Hernandez and Vallarino were under a basic duty to at least perform a cursory examination of the business character and conduct of those individuals selected by Phan and Wallack to trade the funds of Plaintiffs and other students of My Forex Planet.  Hernandez and Vallarino did not bother to conduct any sort of meaningful inquiry.

46.     From July 2008 onward, Phan and Wallack continued their efforts to build a ready base of investors for their currency trading swindle through promoting My Forex Planet through video testimonials and continuing affinity with students of the Meditation class.

47.     By the Summer of 2008, Phan and Wallack had students of My Forex Planet clamoring for a pooled investment vehicle apart from Wal USA and Wal Costa Rica that utilized the strategies utilized by Phan for her purported successful trading, as some students had lost substantial sums of money trading themselves under the watch of Phan and My Forex Planet.  Phan and Wallack, however, realized that they could

**VERIFIED COMPLAINT**

16

not manage such large sums of real money without forming an investment vehicle that would ultimately hold them accountable as investment managers.

48.     With the crash of Lehman Brothers in September 2008 and its effects on the real estate and financial markets, Phan and Wallack needed to accelerate their plans to generate funds to keep their California property portfolio afloat and to satisfy the demand they had created for a pooled trading vehicle.  In order to facilitate their scheme, Phan and Wallack determined that a new trading vehicle promising exorbitant returns would provide the flow of customer funds they needed.

49.     As such, Phan and Wallack sought a currency manager that would (a) provide the pooled vehicle they needed, (b) would appear to mimic the trading strategies utilized by Phan and (c) would introduce trades through Wal USA or Wal Costa Rica for clearance through the ChoiceFX system to Dukascopy.

50.     On information and belief, in Fall 2009, personnel at either CTN or Dukascopy introduced Phan and Wallack to one or more currency traders (see ¶30, *supra*) who met their requirements and who would be willing to manage a pooled investment vehicle.  Upon identification of the trader(s), Phan and Wallack again contacted Coldwell to form an offshore entity to facilitate the trading in which several of the Plaintiffs and others wanted to participate.  That entity was TGC.

51.     On information and belief, Coldwell contacted the Fairfield Law Firm on behalf of Phan and Wallack in October 2009 to form TGC in Panama.  The Fairfield

**VERIFIED COMPLAINT**

17

Law Firm (whose officers were Defendants Hernandez and Vallarino) was designated as the President of TGC, Defendant Hernandez designated as its Secretary and Defendant Vallarino designated as its Treasurer.  On November 2, 2009, the formation of TGC was complete.

52.    In November 2009, Phan and Wallack had funds at the ready in the Wal Costa Rica accounts to deposit in TGC from students of My Forex Planet, including Plaintiffs.  The plan was to have Wal Costa Rica introduce trades (or create the appearance of such trades) for TGC to Dukascopy through CTN, with Wal Costa Rica and other entities under the control of Phan and Wallack receiving referral fees and commissions from the trading activity of TGC.  On information and belief, funds of students of My Forex Planet were also transferred to Wal Costa Rica.

53.    Under the corporate laws of Panama, Fairfield Law Firm, Hernandez and Vallarino were under a basic duty to at least perform a cursory examination of the business character and conduct of those individuals selected by Phan and Wallack to trade the funds of Plaintiffs and other students of My Forex Planet in TGC.  Hernandez and Vallarino did not bother conduct any sort of inquiry.  Had Fairfield Law Firm, Hernandez and Vallarino conducted even the most cursory of inquiries, they would have learned that the principals of TGC and their so-called "traders" (see ¶30, *supra*) were scam artists and that they had no intention of conducting the meaningful trading of currency.

**VERIFIED COMPLAINT**

18

54.     Plaintiffs' deposits of funds for investment into TGC took place between October 2009 and June 2010.  All Plaintiffs in this action knowingly committed funds to TGC via Wal Costa Rica or other entities.   In several instances, credit card remittances for funds for investments for Wal Costa Rica were apparently processed through My Forex Planet, Zenoost and other entities under the control of Phan and Wallack.   In these instances, funds were wired from the merchant accounts of these entities to either Wal USA or Wal Costa Rica for investment in TGC.  A sample wire instruction form for a Wal Costa Rica wire transfer is annexed hereto as ***Exhibit "3."***

55.     Between October 2009 and August 2010, investors in TGC received statements of trading activity from Wal Costa Rica through the website of My Forex Planet and directly from emails from Phan and Wal USA.  See exemplar of statement annexed hereto as ***Exhibit "4."***   While these statements showed profitable trading activity with TGC, these statements actually reflected "demo" activity rather than live activity with TGC.  The reason for the provision of "demo" statements was to conceal the fact that TGC was not a legitimate trading enterprise and in fact its traders (see ¶30, *supra*) were misappropriating the funds of Plaintiffs and other investors whose funds were committed to TGC.  If Phan and Wallack were actually the ones trading on behalf of TGC, that fact was never fully disclosed by them in suitable offering memoranda or contracts with those whose funds were committed, knowingly or otherwise, to TGC.

**VERIFIED COMPLAINT**

19

9594801_4

56.     With regard to the account statements of Wal Costa Rica for TGC account activity, the principals of TGC and Dukascopy knew or should have known that the statements furnished to investors in TGC were fake or reflected fictitious or fraudulent trading activity.  This is because, *inter alia*, the commissions paid to Wal Costa Rica did not reflect the volume of trading in the "demo" statements.  As such, Wal Costa Rica, and thus Wal USA, My Forex Planet, Phan, Wallack and other entities under the control of Phan and Wallack also knew or should have known that the trading statements were fake or reflected fictitious or fraudulent activity.

57.     In May 2010, TGC through Wal Costa Rica and My Forex Planet announced that they would no longer be using the services of CTN but would instead utilize the services of Defendant Metatrader.  Wal Costa Rica, through My Forex Planet, also informed investors that Phan would be resigning from Wal Costa Rica to "concentrate on her spiritual life." Notwithstanding this representation, Phan continued to have an active role in the conduct of business with investors such as Plaintiffs and Wal USA, Wal Costa Rica and TGC.

58.     In June 2010, TGC through My Forex Planet and Wal Costa Rica informed Plaintiffs and other investors that the TGC "program" in which they were invested was being discontinued.  TGC also informed Plaintiffs and others that funds originally committed to TGC would be moved over to another TGC trading "program"

**VERIFIED COMPLAINT**

20

and that account activity, including redemption requests, would be delayed while this switch was taking place.

59.   The purported "switch" in programs was a ploy by TGC to essentially cease operations while it and its traders (see ¶30, *supra*) further absconded with the funds of Plaintiffs and other investors.  Nonetheless, Dukascopy and Metatrader were still handling transactions for TGC, including withdrawals by TGC, while the purported program "switch" was taking place.

60.   Dukascopy, Moskowitz and CTN knew or should have known that TGC was not a legitimate trading enterprise given the wiring of large sums of money out of accounts of TGC elsewhere.  Wal Costa Rica and thus Phan and Wallack knew or should have known that these large fund transfers were taking place, as the disposition of these funds would necessarily be recorded on statements of account that they would receive.

61.   Between August-September 2010, Cain requested the redemption of $20,000 of his interests in TGC.  On September 21, 2010, Cain finally received $20,000 by way of a wire from Wal USA.  On information and belief, these funds were not derived from accounts of Wal Costa Rica or TGC but from Phan personally.  These funds were provided to Cain by Phan as a deliberate effort to conceal what Phan, Wallack, Dukascopy, Moskowitz and CTN knew or should have known were frauds committed by TGC in the handling of investor funds.

**VERIFIED COMPLAINT**

21

62.     Knowing that further redemption requests of the magnitude of Cain's could not possibly be honored given the realization that TGC was a fraud, Phan and Wallack determined that they needed time to gather more client funds to pay back the TGC Plaintiffs and others what was estimated be at least $2 million.  Nonetheless, Wal Costa Rica continued to accept funds for investment into TGC through its accounts with Bank of America in California.  The likely reason for the acceptance of such funds by Wal Costa Rica for investment with TGC at this point was that Phan and Wallack were likely receiving monetary benefits from TGC for the acceptance of such funds.

63.     Between September 2010 and December 2010, Phan reported to the TGC Plaintiffs and others that Wal Costa Rica was in "merger" discussions with Defendant Apex.  Phan further disclosed that once the "merger" was complete, redemption requests from TGC could be honored.  Among other reasons given was that the Queen of Malaysia was to commit over $1 billion of funds to Wal Costa Rica and Phan for trading once the "merger" was complete.  This was false and misleading, as the Queen of Malaysia could not possibly commit $1 billion to a roughshod operation such as Wal Costa Rica.

64.     The statements regarding Apex and authorized by its officers (see ¶30, *supra*) were false when made by Phan, Wallack and Wal Costa Rica as Apex had not yet even been formed as a corporation in Hong Kong or anywhere else.

**VERIFIED COMPLAINT**

22

9594801_4

65.   On information and belief, Phan and Wallack thereafter contacted Coldwell to form another offshore corporation, this time in Hong Kong.  Wallack apparently traveled to Hong Kong in November or December 2010 to facilitate the opening of bank accounts at HSBC and to complete corporation documentation with officers of Apex (see ¶30, *supra*) to effect the "merger" of Wal Costa Rica with the new Hong Kong company.  The name of the Hong Kong company was Apex.

66.   However, the plan concocted by Phan and Wallack hit a roadblock.  On December 9, 2010, Swiss financial regulators "blacklisted" Wal Costa Rica.  As such, Dukascopy and Metatrader could no longer lawfully transact business with Wal Costa Rica.  Dukascopy and Metatrader knew or should have known Wal Costa Rica was blacklisted and that Apex would continue to conduct the same business with TGC as Wal Costa Rica.  Nonetheless, Dukascopy and Metatrader continued their venture with Phan and Wallack through continuation of their services with Apex, a known alter-ego of the blacklisted Wal Costa Rica, and continued to provide false and misleading account activity reports to Plaintiffs.  The officers/directors of Apex (see ¶30, *supra*) knew or should have known that the entity that they were acquiring was blacklisted by Swiss financial authorities, but nevertheless continued with the transaction.

67.   On December 11, 2010, Apex was formed in Hong Kong.  Nonetheless, redemption requests continued to pour in for funds that were apparently missing and/or misappropriated by TGC.  In certain instances, as in the case of Plaintiff DiCosimo,

**VERIFIED COMPLAINT**

23

purported redemptions in TGC were paid by Phan directly.  In other instances, entities controlled by Phan and Wallack such as Zenoost transmitted purported redemptions from TGC.  None of the proceeds of these redemptions appear to have originated from any accounts of TGC maintained by Dukascopy. On information and belief, Phan and Wallack also facilitated the formation of TGC Hong Kong from which redemption proceeds were wired from accounts in its name at HSBC.  See *Exhibit "5"* annexed hereto.

68.     On March 17, 2011, in light of numerous unfulfilled redemption requests, Phan communicated via email to Plaintiffs and others that she was involved in the process of returning over $2 million to Plaintiffs and other investors.  Phan further communicated with Plaintiffs and other investors to inform them of a forthcoming "withdrawal schedule" to return investors' funds.  See *Exhibit "6"* annexed hereto. Plaintiffs and other investors were never informed of anything further about the "withdrawal schedule" following this communication, due likely to the fact that Phan and Wallack were seeking additional funds from others to pay money committed to TGC by Plaintiffs and other investors back.

69.     On April 25, 2011, Phan informed Plaintiffs that she was being questioned by the CFTC regarding activities of Wal USA, Wal Costa Rica and TGC. Phan instructed some Plaintiffs to not contact her.   See *Exhibit "7"* annexed hereto.

**VERIFIED COMPLAINT**

24

70.    In June 2011, sweeping Dodd-Frank reforms prohibited the handling of many accounts beneficially held by United States residents with unregistered currency trading entities outside of the United States.  TGC, Wal Costa Rica and Dukascopy were such currency trading entities.  In this regard, TGC and Wal Costa Rica informed the TGC Plaintiffs and others that their accounts would be closed and their proceeds returned.  The communication to close these accounts, on information and belief, came from Dukascopy, given a news release it posted regarding its closure of accounts beneficially held by United States investors.   See ***Exhibit "8"*** annexed hereto. Nonetheless, Phan and Defendants Alcaraz, Baker and others continued to inform the TGC Plaintiffs and others that "regulatory review" and other factors were delaying the redemption of their interests in TGC when in fact their funds were gone.

71.    Given the fact that Dukascopy communicated with parties in the United States regarding the closure of the accounts of TGC and Wal Costa Rica, Dukascopy knew that the origin of the funds sent from TGC elsewhere were those of Plaintiffs and other investors trading through My Forex Planet and Wal Costa Rica via Wal USA and other entities controlled by Phan and Wallack.   Notwithstanding this knowledge, Dukascopy failed to inform Plaintiffs or others of the whereabouts or disposition of their funds committed to TGC.

72.    Notwithstanding representations by Phan, Baker and Alcaraz that funds committed to TGC were "safe and secure," Alcaraz responded to an inquiry from Cain

**VERIFIED COMPLAINT**

25

on September 13, 2011 regarding redemptions by instructing Cain not to contact the CFTC while he sought to attend to his requests.  See ***Exhibit "9"*** annexed hereto.

73.    The representations by Phan, Baker and Alcaraz about the safety of the custody of funds committed to TGC were false when made, as Phan continued to facilitate the payment of redemption proceeds of funds committed to TGC through Zenoost and other corporate entities she and Wallack controlled, including a beauty enterprise operated by Phan.  Further, on information and belief, there was no money to be distributed from TGC directly.

74.    Later, Phan emailed Plaintiffs and others to again disclose what apparently happened to the investments of Plaintiffs and others committed to TGC.  Phan represented that funds traded by TGC were not in accounts of Wal USA or Wal Costa Rica but instead were in a "Turkish/Cypriot" account since at least March 2011 and that they could not be accessed due to Muslim Sharia law.  See ***Exhibit "10"*** annexed hereto.

75.    On the assumption that Phan's representations were correct, Dukascopy and Metatrader were aware as late as March 2011 that the funds committed to TGC by United States investors were misappropriated and likely violated United States OFAC regulations and other related laws.  Dukascopy and Metatrader utterly failed to act upon this knowledge in any manner to take even the most basic steps to protect the funds of Plaintiffs and other investors committed to TGC.  Further, the inability to

**VERIFIED COMPLAINT**

26

withdraw funds from TGC and Wal Costa Rica due to Sharia Law restrictions was never disclosed by Dukascopy, Metatrader or others up until Phan's email.

Had Plaintiffs been informed of such restrictions, they would never have committed their funds to TGC and Wal Costa Rica for investment.

76. On December 9, 2011, Cain logged into an on-line customer service chat center for Apex to inquire as to the status of redemptions at TGC. Cain was connected with a representative of Apex by the name of "Vanessa." Vanessa told Cain that redemptions were in the process of being handled as soon as "he" determined. Cain asked Vanessa who "he" was. Vanessa told Cain that she could not disclosed who the "he" was. See *Exhibit "11"* annexed hereto.

77. Following Cain's conversation with Vanessa, Phan visited Cain in late December 2011 at his home in Arizona to discuss the return of his funds and that of other investors in TGC. Phan asked Cain for $20,000 to trade through a North Carolina company to recoup his money and that of Plaintiffs and other investors. Cain refused. Neither Cain nor any of Plaintiffs have had any communications with Phan, Wallack, Wal USA, Wal Costa Rica, Apex or TGC regarding the disposition of their investments in TGC since then.

## CAUSES OF ACTION

### NEGLIGENCE

**VERIFIED COMPLAINT**

27

9594801_4

**(against TGC and its principals, Wal USA, Wal Costa Rica and its principals, My Forex Planet, CTN, Moskowitz, Metatrader, Dukascopy, Coldwell, Fairfield, Phan, Wallack, Baker and Alcaraz)**

78.   Paragraphs 1 through 77 are repeated as if stated in their entirety.

79.   Plaintiffs were owed common law duties by some or all of the Defendants which were breached.

80.   TGC and its principals (Fairfield Law Firm, Hernandez and Vallarino) had common law duties to, *inter alia*, take reasonable steps to provide that the committed funds of Plaintiffs (either directly to TGC or otherwise) were handled by competent professionals in a manner consistent with Plaintiffs' investment objectives and financial situations.  Further, TGC and its principals had a common law duty conduct themselves honestly and openly in their handling and custody of Plaintiffs' funds.  TGC and its principals also had a common law duty to take all reasonable steps to assure Plaintiffs that their invested funds were not mishandled, commingled or misappropriated.

81.   TGC and its principals breached the common law duties they each owed to Plaintiffs insofar as, *inter alia* (a) funds invested in TGC were never intended to be managed at all or in accordance with Plaintiffs' investment objectives and financial situations; (b) the principals of TGC were to employ commonly accepted industry standards in their supervision of the trading activity undertaken by Plaintiffs but completely failed exercise even a modicum of surveillance of the trading and

**VERIFIED COMPLAINT**

28

misappropriation taking place at TGC, including but not limited to the delivery of funds to investment managers without any due diligence; (c) TGC and its principals did not communicate honestly and fairly with Plaintiffs with respect to the status, liquidity and performance of their investments and withdrawals of their interests in such investments; and/or (d) concealed the identity of those responsible for trading activities and negligently misrepresented the "transfer" of funds from one program of TGC to another when in fact those funds had been already been dissipated, commingled or misappropriated.

82. Wal USA, Wal Costa Rica, My Forex Planet, Phan and Wallack had common law duties to, *inter alia*, delegate management the committed funds of Plaintiffs to competent professionals in a manner consistent with their investment objectives and financial situation. Further, Wal USA, Wal Costa Rica, My Forex Planet, Phan and Wallack had a common law duty conduct themselves honestly and openly in their handling and custody of Plaintiffs' committed funds. Wal USA, Wal Costa Rica, Phan, Wallack, My Forex Planet, Casares and Vilchez also owed Plaintiffs a common law duty to take all reasonable steps to assure Plaintiffs that their committed funds were not mishandled, commingled or misappropriated.

83. Wal USA, Wal Costa Rica, My Forex Planet, Phan, Wallack, each breached the common law duties they each owed to Plaintiffs insofar as *inter alia* (a) they failed to conduct any meaningful due diligence or investigation of TGC and its

**VERIFIED COMPLAINT**

29

principals, (b) funds delivered to Wal USA and/or Wal Costa Rica for investment in TGC were not managed by competent professionals in accordance with the investment objectives and financial situation of those whose funds were committed there, if indeed they were traded at all; (c) they were to employ commonly accepted industry standards in the supervision of the trading activity undertaken by Plaintiffs by Wal Costa Rica and TGC but completely failed exercise even a modicum of surveillance of the trading and misappropriation taking place, including but not limited to the delivery of funds to investment managers without any due diligence; (d) they did not communicate honestly and fairly with Plaintiffs, or facilitated such misleading communications, with respect to the status, liquidity and performance of their investments and withdrawals related to those investments, assisted in the dissemination of false and misleading account information; (e) concealed the identity of those responsible for trading activities, and negligently misrepresented the "transfer" of funds from one program of TGC to another when in fact those funds had been already been dissipated or misappropriated; (f) commingled funds; and/or (f) negligently misrepresented their business skill and acumen in currency trading.  With respect to Casares and Vilchez, they also each bore common law duties to ensure that the funds traded in the name of the company for which they were officers and directors were not procured by fraud but instead as the product of sound and deliberate business judgment on their part and that of their agents.  Both Casares and Vilchez breached these duties.

**VERIFIED COMPLAINT**

30

84.     Alcaraz and Baker had common law duties to, *inter alia*, conduct themselves honestly and openly in their employer's disposition of Plaintiffs' funds. Baker, as Operations Manager of Wal Costa Rica, also had a common law duty to take all reasonable steps to assure Plaintiffs that their funds were not mishandled, commingled or misappropriated.  Alcaraz, as TGC's lead marketer, possessed special knowledge of the true state of affairs with Wal Costa Rica, Apex and TGC.

85.     Alcaraz and Baker breached the many duties they each owed to Plaintiffs insofar as *inter alia* they did not communicate honestly and fairly with Plaintiffs with respect to the status, liquidity and performance of their investments and withdrawals related to those investments and the commingling of assets, assisted in the dissemination of false and misleading account information, and also intentionally or recklessly concealed the identity of those responsible for trading activities.

86.     Baker breached the duties he owed to Plaintiffs whose funds were committed to TGC insofar as *inter alia*, he (a) failed to conduct any meaningful due diligence or investigation of TGC and its principals, (b) funds delivered to Wal USA and/or Wal Costa Rica under his watch for investment in TGC were not managed by in accordance with the investment objectives and financial situation of those whose funds were committed there; and/or (c) was to employ commonly accepted industry standards in supervision of the trading activity undertaken by TGC through Wal Costa Rica, including but not limited to the commingling of funds.

**VERIFIED COMPLAINT**

31

87.    CTN (under the sole control of Moskowitz) and Metatrader had common law duties to, *inter alia*, conduct appropriate due diligence on the repute and business character of parties with whom they each contracted to facilitate currency trading, fully understanding that the failure to do would lead to the dissipation or diminution of funds invested through their respective systems.  Further, both CTN and Metatrader had common law duties to ensure that sales materials bearing their names were truthful and accurate as TGC, Wal Costa Rica, Apex, Wallack and Phan were each acting as apparent agents of CTN and Metatrader.  Finally, CTN and Metatrader had a duty to ensure that account trading information from their system was complete, accurate and for the activities conducted on behalf of their respective customers.

88.    CTN (acting through Moskowitz) and Metatrader each breached their common law duties to Plaintiffs insofar as, *inter alia*, (a) they failed to conduct any meaningful due diligence on TGC or its principals, knowing that the Wal Costa Rica was acting as an introducing broker for TGC, (b) permitted TGC, Phan, Wallack and Wal Costa Rica to co-opt their name in promotional materials to provide requisite credibility to those considering investments in TGC or Wal Costa Rica, and/or (c) generated, assembled and disseminated account statements for activity at TGC through Wal Costa Rica they knew or should have known was false.

89.    Through its contacts and conduct of business in the United States, Coldwell owed Plaintiffs common law duties of good faith and fair dealing in its

**VERIFIED COMPLAINT**

32

formation and registration of offshore entities for legitimate business purposes on their behalf.  Coldwell knew or should have known that the offshore entities it formed, one of which had an address of record in its own offices in London, England, were not so engaged and never intended to engage in legitimate business activities but rather in frauds against Plaintiffs and other investors.  Coldwell failed to warn Plaintiffs or disclose this information to investors.  Coldwell also had a basic obligation to review the bona-fides of the principals of Wal Costa Rica and TGC but failed to do so.

90.   Dukascopy had common law duties to, *inter alia*, to take all reasonable steps to assure Plaintiffs that their invested funds were not mishandled or misappropriated and that all information provided to investors based on trade data provided for their use were accurate and complete.

91.   Dukascopy breached the common law duties it each owed to Plaintiffs insofar as *inter alia* it (a) failed to conduct any meaningful due diligence or investigation of TGC and its principals, (b) knew or should have known funds delivered to Wal USA and/or Wal Costa Rica were not invested but either commingled and/or misappropriated yet failed to act in any proactive manner; (c) was to employ commonly accepted industry standards in their supervision of the trading activity and transfers of funds taking place at TGC, (d) facilitated misleading communications with respect to the status, liquidity and performance of their investments and withdrawals related to those investments, assisted in the dissemination of false and misleading

**VERIFIED COMPLAINT**

33

account information while (e) understanding that the funds invested in TGC through Wal Costa Rica were those of United States citizens for which it did not perform any anti-money laundering (AML) or OFAC analyses.

92.    The aforementioned breaches of duty are direct and proximate causes of Plaintiffs' damages.  As such, each of the Defendants are liable to Plaintiffs under causes of action for negligence.

## BREACH OF CONTRACT

### (against TGC, Wal USA, Wal Costa Rica, My Forex Planet, CTN, Metatrader, Dukascopy, Phan and Wallack)

93.    Paragraphs 1 through 92 are repeated as if stated in their entirety.

94.    My Forex Planet, Wal USA and Wal Costa Rica, acting through Phan and Wallack, bargained with Plaintiffs for good and valuable consideration to conduct their business dealings in good faith to manage their investments.  My Forex Planet, Wal USA and Wal Costa Rica, acting through Phan and Wallack, breached their express and implied contracts with Plaintiffs insofar as *inter alia* (a) they failed to conduct any meaningful due diligence or investigation of TGC and its principals, (b) funds delivered to Wal USA and/or Wal Costa Rica for investment in TGC were not managed by competent professionals in accordance with Plaintiffs' investment objectives and financial situation as promised by each of them, if they were traded at all; (c) they were to employ commonly accepted industry standards in their supervision

**VERIFIED COMPLAINT**

34

of the trading activity undertaken by Plaintiffs by TGC but completely failed exercise even a modicum of surveillance of the trading, commingling and misappropriation taking place at TGC, including but not limited to the delivery of funds to investment managers without any due diligence; and/or (d) they did not communicate honestly and fairly with Plaintiffs with respect the status, liquidity and performance of their investments and withdrawals related to those investments, assisted in the dissemination of false and misleading account information and concealed the identity of those responsible for trading activities at TGC.  Further, My Forex Planet breached its contractual obligations to Plaintiffs in its provision of currency trading as a front to lure them and other investors to commit funds to Wal Costa Rica, Wal USA and TGC.

95.   TGC bargained with Plaintiffs for good and valuable consideration to conduct its business dealings in good faith to manage their committed funds.  TGC breached its express and implied contracts with Plaintiffs insofar as *inter alia* it (a) promised to manage the Plaintiffs' committed funds prudently but instead misappropriated them; (b) failed to manage the Plaintiffs' committed funds with competent professionals in accordance with their investment objectives and financial situation; (c) was to employ commonly accepted industry standards in their supervision of the trading activity handled on behalf of Plaintiffs but completely failed to exercise even a modicum of surveillance of the trading and misappropriation taking place, including but not limited to the delivery of funds to investment managers without any

**VERIFIED COMPLAINT**

35

due diligence; and/or (d) did not communicate honestly and fairly with Plaintiffs with respect to the status, liquidity and performance of their investments and withdrawals related to those investments, assisted in the dissemination of false and misleading account information and concealed the identity of those responsible for trading activities to Plaintiffs.

96.    CTN (under the control of Moskowitz) and Metatrader bargained with Plaintiffs as interest holders in TGC and Wal Costa Rica for good and valuable consideration to conduct their respective business dealings with Plaintiffs in good faith. CTN and Metatrader breached their contracts with Plaintiffs insofar as *inter alia* they (a) did not communicate honestly and fairly with Plaintiffs with respect to the status of their committed funds and withdrawals related to those funds, (b) assisted in the dissemination of false and misleading account information and (c) allowed Phan and Wallack to co-opt their business reputation to act their apparent agents.

97.    Dukascopy breached the express and implied contracts it had with Plaintiffs through Wal Costa Rica and TGC insofar as, *inter alia,* it (a) failed to conduct any meaningful due diligence or investigation of TGC and its principals, (b) knew or should have known funds delivered to Wal USA, Wal Costa Rica and TGC were not invested but misappropriated and/or commingled, but failed to act in any proactive manner; (c) was to employ commonly accepted industry standards in their supervision of the trading activity and transfers of funds taking place at Wal USA, Wal

**VERIFIED COMPLAINT**

9594801_4

Costa Rica and TGC, (d) facilitated misleading communications with respect to the status of committed funds and withdrawals related to those funds, assisted in the dissemination of false and misleading account information while (e) understanding that the funds committed to TGC through Wal Costa Rica were those of United States citizens for which it did not perform any anti-money laundering (AML) or OFAC analyses.

98.    The aforementioned breaches of contract are actual causes of damage to Plaintiffs.  Accordingly, Plaintiffs are entitled to contractual damages from each of the Defendants for their respective breaches.

## BREACH OF FIDUCIARY DUTY / AIDING & ABETTING BREACH OF FIDUCIARY DUTY

**(against TGC and its principals, Wal Costa Rica and its principals, Apex and its principals, Phan, Wallack and Dukascopy)**

99.    Paragraphs 1 through 98 are repeated as if stated in their entirety.

100.   TGC as a discretionary investment manager owed fiduciary duties to the investors for whom it provided management services on a discretionary basis. Included within these fiduciary duties are, *inter alia*, (a) management of the invested funds of Plaintiffs by competent professionals in a manner consistent with their investment objectives and financial situation and (b) employment of all reasonable measures to assure that the committed funds of Plaintiffs were not mishandled or misappropriated.

**VERIFIED COMPLAINT**

37

101.   TGC breached these and other fiduciary duties owed to those whose funds were committed there, including Plaintiffs.  TGC failed to manage Plaintiffs' funds on a discretionary basis with competent professionals in accordance with Plaintiffs' stated investment objectives and financial situations.  TGC also failed to take any measures to prevent the mishandling or misappropriation of funds, including but limited to its failure to perform any due diligence on those to whom it allocated funds for investment.  TGC possessed special knowledge of its activities and those with whom it chose to handle Plaintiffs' committed funds, and TGC failed to act upon that knowledge for the benefit of and other investors in TGC.  The officers and directors of TGC (Hernandez, Vallarino and Fairfield Law Firm) are charged with the special knowledge of their agents and employees.   As such, these individuals aided and abetted the breaches of fiduciary duty by TGC.

102.   Wal Costa Rica was entrusted with the committed funds of Plaintiffs. Because trading of TGC was necessarily reported to Wal Costa Rica as an introducing broker, Wal Costa Rica possessed special knowledge of the behavior of the nature of currency trading conducted at TGC.  Wal Costa Rica failed to disclose any of its knowledge of wrongdoings at TGC to those whose funds were committed there, and it failed to act upon this knowledge to prevent funds from being misappropriated or lost. The officers and directors of Wal Costa Rica (Casares and Vilchez) are charged with

**VERIFIED COMPLAINT**

38

the special knowledge of their agents and employees.  As such, these individuals aided and abetted the breaches of fiduciary duty by TGC.

103.   Apex was later entrusted with Plaintiffs' money for purposes of investing in TGC.   On information and belief, money committed to Wal Costa Rica was commingled with TGC funds as Apex.  Because trading of TGC was necessarily reported to Apex as an introducing broker, Apex and its officers/directors possessed special knowledge of the behavior of the nature of currency trading conducted at TGC. Apex failed to disclose any of its knowledge of wrongdoings at TGC to Plaintiffs and it failed to act upon this knowledge to prevent Plaintiffs' investments from being misappropriated or lost. The officers and directors of Apex are charged with the special knowledge of their agents and employees.  As such, these individuals aided and abetted the breaches of fiduciary duty by TGC.

104.   All trading conducted through Wal Costa Rica and Apex on behalf of TGC was cleared and settled through Dukascopy.  Further, all account contributions, redemption requests and the like were necessarily communicated from Wal Costa Rica or Apex to TGC.  Because trading of TGC introduced by Wal Costa Rica or Apex to Dukascopy, Dukascopy possessed special knowledge of the behavior of the nature of currency trading conducted at TGC.   Dukascopy failed to disclose any of its knowledge of wrongdoings or "red flags" at TGC to Plaintiffs, and it completely failed to act upon this knowledge to prevent Plaintiffs' committed funds from being

**VERIFIED COMPLAINT**

39

9594801_4

misappropriated or lost. As such, these individuals aided and abetted the breaches of fiduciary duty by Wal Costa Rica and Apex.

105.   Phan and Wallack were the controlling persons of Wal Costa Rica who ultimately lured Plaintiffs' to invest in TGC.  Because trading of TGC was necessarily reported to Wal Costa Rica as an introducing broker, Phan and Wallack possessed special knowledge of the behavior of the nature of currency trading conducted at TGC. On information and belief, Phan and Wallack also knew that funds committed to Wal Costa Rica were commingled with those investors in TGC.  Phan and Wallack failed to disclose any of their knowledge of wrongdoings at TGC to Plaintiffs and they failed to act upon this knowledge to prevent Plaintiffs' investments from being misappropriated or lost.

106.   All of the aforementioned breaches of fiduciary duties are the direct and proximate cause of Plaintiffs' damages.  Accordingly, each of the Defendants that breached the fiduciary duties owed to Plaintiffs may be held liable for all damages directly related to those breaches and aiding and abetting of same.

## CONVERSION / AIDING AND ABETTING CONVERSION
### (against all Defendants)

107.   Paragraphs 1 through 106 are repeated as if stated in their entirety.

**VERIFIED COMPLAINT**

40